# EXHIBIT A

# Law Office of Jack Silver

P.O. Box 5469   Santa Rosa, California 95402-5469
Phone 707-528-8175   Fax 707-528-8675
warrioreco@yahoo.com



May 17, 2007

Dirk Kempthorne, Secretary of the Interior
United States Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

H. Dale Hall, Director
United States Fish & Wildlife Service
1849 C Street, N.W.
Washington DC 20240

David Allen, Region 1 Director
United States Fish and Wildlife Service
Eastside Federal Complex
911 N.E. 11th Ave.
Portland, OR 97232-4181

United States Fish and Wildlife Service
Sacramento Fish and Wildlife Office
2800 Cottage Way, Room W-2605
Sacramento, California 95825

LTG Carl Strock, Commander
Headquarters
United States Army Corps of Engineers
441 G Street, N.W.
Washington, D.C. 20314-1000

Colonel Ronald N. Light, District Engineer
U.S. Army Corps of Engineers
Sacramento District
1325 J Street
Sacramento, CA 95814-2922

Re:   **Notice of Violations and Intent to File Suit Under the Endangered Species Act**

Dear Secretary, Directors, Federal Agencies and Services:

On or about July 21, 2006 and August 18, 2006, Robert G. Evans, Douglas Rand Emery and Northern California River Watch, served a 60-day Notice of Violations and Intent to File Suit Under the Endangered Species Act ("Notice"). On October 27, 2006 they then as plaintiffs, filed a lawsuit in the United States District Court, Northern District of California entitled *Northern California River Watch, et al v. California Department of Fish and Game, et al*, Case No. C06-06685 CRB. On January 29, 2007, those plaintiffs filed a First Amended Complaint against California Department of Fish and Game, Carl Wilcox, Gene Cooley, Robert W. Floerke, William R. Schellinger and Frank H. Schellinger Individually and dba Schellinger Brothers, a Partnership, Cotter Health Centers, Inc, Assessment Technologies USA LC and Does 1-10. Cotter Health Centers, Inc, and Assessment Technologies USA LC have been dismissed from the lawsuit without prejudice.

Page 1 of 10

The Endangered Species Act ('ESA") § 11(g), 16 U.S.C. § 1540(g), requires that sixty (60) days prior to the initiation of a civil action under the ESA, a person must give notice of his/her intent to file suit to the alleged violator and the Secretary of Interior, Commerce or Agriculture.

The Secretary of the U.S. Department of the Interior ("SECRETARY"), United States Fish and Wildlife Service ("FWS") and the Army Corps of Engineers ("ACOE") (collectively, "VIOLATORS") are herewith provided with notice that after the expiration of 60 days, from the date of this Notice, Robert G. Evans, Douglas Rand Emery and Northern California River Watch ("PLAINTIFFS") intend to bring suit against VIOLATORS in Federal District Court for the violations of the ESA as set forth herein, and will further request that said lawsuit be joined with the current action filed under Case No. C06-06685 CRB.

## SITE DESCRIPTION

The plants and animals identified in this Notice as being affected by the violations of VIOLATORS are located on property at 955, 995, and 997 Gravenstein Highway in the City of Sebastopol, California, Assessor's Parcel Numbers 004-390-003, 004-390-006, 004-390-009, 004-390-010, 004-390-011 and 151-010-012) (hereafter "the Site").

The Site is owned by Cotter Health Centers, Inc. Development of the Site is proposed by Schellinger Brothers, a Partnership comprised of William R. Schellinger and Frank H. Schellinger. That Partnership exercises control over the Site according to Schellinger Brothers' attorney Christopher J. Carr.

The Site currently is primarily undeveloped, but does contain 5 small residences and an 1,800 square foot daycare facility. At the time the Complaint was filed by PLAINTIFFS, Schellinger Brothers proposed to build a planned community consisting of 145 housing units of various sizes and designs, and a 9.53-acre public open space/wetland preserve ("the Project"). Recently Schellinger Brothers has presented an alternative design to the City of Sebastopol.

The majority of the Site is currently undeveloped, open space consisting of wetlands, seasonal vernal pools and open grassland. The proposed zoning designation for the Site is 'Planned Community'. The ACOE has declared 1.84 acres of the Site to be jurisdictional wetlands and therefore under federal jurisdiction. PLAINTIFFS believe that approximately two thirds of the Site consists of jurisdictional wetlands due to its adjacency to navigable in fact waters of the United States.

The Site lies within the range of the federally endangered Sonoma County Distinct Population Segment of the California tiger salamander (*Ambystoma californiense*), Sonoma sunshine (*Blennosperma bakeri*), Burke's goldfields (*Lasthenia burkei*), and Sebastopol meadowfoam (*Limnanthes vinculans*).

## IMPACT ON LISTED PLANT SPECIES

### Adverse Impact on Sebastopol Meadowfoam (*Limnanthes vinculans*)

The actions of VIOLATORS as further set forth in this Notice have and continue to have adverse impacts on Sebastopol meadowfoam listed as a Federal Endangered Species under the ESA of 1973, as amended (16 U.S.C. § 1531 et seq). (Federal Register 56:61173; December 2, 1991). Said actions of VIOLATORS have destroyed and continue to destroy existing plants and most of the plants' habitat. VIOLATORS have been agents for the destruction and removal of *L. vinculans* in the past, and currently threaten destruction and removal of *L. vinculans*.

The FWS has jurisdiction over species that are formally listed as threatened or endangered under the Federal ESA. The FWS sent a letter to the ACOE on March 12, 2004, stating that surveys of federally listed plants had been conducted on the Site and no federally listed plants had been found. FWS incorrectly concluded the Project was not likely to have an adverse affect on *L. vinculans*.

The surveys referred to by FWS (and cited as well in the Draft EIR) were not reliable. Most of the surveys were conducted by Golden Bear Biostudies ("GBB") and paid for by Schellinger Brothers, an interested party. Survey protocols either were not routinely followed, or were inconsistent with accepted, standard, rare plant survey protocols required by the California Department of Fish & Game ("DFG") or the California Native Plant Society, or were simply not stated. Some surveys were at odds with the season, meaning the resulting survey was limited by water covering the ground or was conducted outside the Sebastopol meadowfoam's flowering season. Also, by the time these surveys began (i.e. in May 1998) the Site was being mowed routinely and thoroughly by either the landowner or the developer.

A close look at the record indicates that plant surveys on the Site were neither systematic nor thorough as the following chronology demonstrates:

May 5, 1998 – This survey was completed by GBB and paid for by Schellinger Brothers. GBB does not state what protocols were used. The survey was conducted before disclosure of wetlands on the westerly portion of the Site. May 5th is potentially a good date for observing *L. vinculans*, but because more than an acre of wetlands was neither disclosed or observed, and because the Site was thoroughly mowed, the plant list in the survey is not comprehensive. For example, it does not include any common meadowfoam (*L. douglassii*), manna grass (*Glyceria occidentalis*) or any other species expected to be found on the Site at this season.

May 26, 1998 – As with the May 5th survey, this survey was completed by GBB for Schellinger Brothers prior to the disclosure of wetlands on the westerly portion of the Site. The site was typically mowed by this date. The plant list in the survey is not comprehensive. GBB does not state what protocols were used.

March 6, 2002 – This survey appears to have been conducted by GBB for Schellinger Brothers on the day the GBB Biological Assessment was produced. As with the prior two surveys, this one was

done before wetlands had been located within the project footprint on the westerly portion of the Site. Furthermore this date is too early most years for observing *L. vinculans*.

March 7, 2003 – Though this survey is referenced in the Draft EIR there are no reports of it in the public record. There is no record of survey methods or protocols, plant lists or any other documentation for this survey. Once again it was conducted by GBB, paid for by Schellinger Brothers, done before wetlands were located within the project's footprint, and the date was too early most years for observing *L. vinculans*.

May 22, 2003 – Though this survey is referenced in the Draft EIR there are no reports of it in the public record. There is no record of survey methods or protocols, plant lists or any other documentation for this survey. Once again, if conducted at all, this survey was conducted by GBB, paid for by Schellinger Brothers and done before wetlands were located within the project's footprint. The Site was typically mowed by this date.

May 29, 2003 – Zander Associates ("ZA") retained by the Laguna Preservation Council, was allowed on the Site for a brief reconnaissance. Despite the fact that the Site had been closely mowed just prior to ZA's arrival and the fact that ZA was closely monitored by representatives of Schellinger Brothers, ZA was able to note extensive wetlands and wetlands indicator plants within the project footprint.

June 19, 2003 – This survey was completed by GBB, paid for by Schellinger Brothers and done in advance of the survey conducted by City of Sebastopol designated independent biologist, Wetlands Research Associates ("WRA"). The Site was mowed by this date. GBB's data sheet of this date lists *Limnanthes vinculans* on the plants list. Two years later GBB will claim *Limnanthes* was listed in error. GBB located the *L. vinculans* near an eastern vernal swale. Two days after the Sebastopol City Council public hearing in which the Council directed Staff to hire an independent biologist to evaluate the presence of previously undisclosed wetlands on the Site, GBB acknowledged for the first time, wetlands and wetlands indicator plants within the footprint of the proposed Project. On November 5, 2003, the ACOE. confirmed the extent of jurisdictional wetlands on the site (a substantial increase from the original GBB Delineation of "zero wetlands" as well as of the second supplementary GBB Delineation).

December 9, 15 and 17, 2003, and January 2, 2004 – WRA conducted surveys on the proposed Project Site and generated a less-than-comprehensive plant list as a result of the fact that the investigations were limited, winter investigations. Moreover, Schellinger Brothers denied WRA access to the Site at the time of the initial application in July 2003, until granted in December 2003. These dates are early in the season for most plants. Nevertheless WRA reports list an uncontested meadowfoam (*limnanthes* sp.) population within the footprint of the proposed Project and confirms the ACOE wetlands delineation.

WRA did report an undetermined species of meadowfoam, which may or may not have been *L. vinculans*. During a May 5, 2005 survey of the site WRA again found clear evidence of a healthy *L. vinculans* population.

Page 4 of 10

February 26, 2004 – representatives from FWS and the ACOE. visited the Site to consider California tiger salamander habitat suitability. This would have been another opportunity to add another date to the list of plant survey dates, but unfortunately it was too early in the season to observe most plant species. Beyond the FWS letter citing the date of the visit, no other documentation exists for this visit.

May 3, 2005 – the Laguna Vista Rare Plant Survey by WRA shows photographs and lists *Limnanthes vinculans* as observed in the same area as their 2003 survey.

April, 2005 – Sebastopol meadowfoam was found growing in the ACOE.' jurisdictional wetlands area on the Site. Local resident and plaintiff Robert G. Evans spotted several plants while he was walking on the Site as he often did for recreation and to observe plants, birds and wildlife in their natural habitat. Mr Evans was not certain the plants were meadowfoam and so sought the opinion of Dr. Philip Northen, professor of Biology at Sonoma State University and expert in endangered plant species in the Sebastopol area. On April 12, 2005, Dr. Northen arrived at the Site about 4:30 p.m., accompanied by Robert G. Evans, Dea Fried, Reny Parker, then-President of the Milo Baker Chapter of the California Native Plant Society and her husband Keith. Some of the plants in question proved to be *L. douglasii* ssp. *nivea*, not an endangered plant, but a number were, indeed, *L. vinculans*. Ms. Parker documented the presence of this species photographically.

The two species of *Limnanthes* were growing in shallow water at the edges of vernal swales, interspersed primarily within stands of semaphore grass (*Pleuropogon californicus*). Individuals of *L. vinculans* were found in two different areas on the eastern portion of the Site. All of the Sebastopol meadowfoam plants were very healthy and were in mid-stage of the bloom. The first area containing *L. vinculans* lay 57 feet south of two large cottonwoods that lie on the Site's northern boundary, as Robert G. Evans measured by tape. It contained two clusters of the plant, each about 40 cm in diameter. One cluster contained 8-10 plants. Counting unopened buds, there were 25-30 flowers in this group. A second cluster contained 4 plants, with 5 flowers total. The second area containing *L. vinculans* was located 60 feet south of the front porch of the southeastern most mobile home in a mobile home park that lies on the Site's northern boundary. Ten to fifteen plants were growing in a cluster of about 1 meter diameter. Dr. Northen counted 25-30 flowers in this group. Dr. Northen was not surprised at finding this endangered species growing naturally on the Site as the habitat has a natural suitability for this species, and the species had been found there over the years.

Dr. Northen notified FWS of the "[p]resence of the endangered Sebastopol meadowfoam, *Limnanthes vinculans* on the site of the proposed Laguna Vista development in Sebastopol." Letter to Jan Knight, Chief, Endangered Species Division U. S. FWS, April 19, 2005.

April 26, 2005 – DFG Environmental Scientist Liam Davis was sent by his supervisor Carl Wilcox to survey the Site. Mr. Davis identified and flagged a number of Sebastopol meadowfoam plants growing on the proposed Project Site, and stated in his Field Notes that the plants were healthy and robust, and that there was no evidence of ground disturbance or transplant.

May 5, 2005 – Micki Kelly, Biological Consultant for WRA also found *L. vinculans* species. Dr. Northen also noted that Dr. Robert E. Preston, Ph. D, Senior Botanist with Jones and Stokes, was

hired by Schellinger Brothers to "examine the recently discovered Sebastopol Meadowfoam," and visited the Laguna Vista Site on May 5, 2005. In his May 11, 2005 report to Marco Waaland, owner of GBB, Dr. Preston noted: "I confirm that some of the plants are *Limnanthes vinculans*," and, "The wetlands in which the plants are growing are seasonal wetlands with species typical of vernal pools in the Santa Rosa area." Further, "the vegetation of those wetlands is consistent with the vegetation at other Sebastopol meadowfoam occurrences reported in CCNDDB [California Diversity Database.]"

After the endangered Sebastopol meadowfoam was discovered growing on the Site, neither the landowner, the developer, nor the DFG made any attempt to protect known populations in the jurisdictional wetlands area where the plants were found, or to protect the area in any way as should have been done. No precautions of any sort were taken.

On May 23, 2005, DFG Regional Manager Robert W. Floerke announced that DFG "has determined that the plants were not naturally occurring on the site," and that "DFG recommends that the presence of these plants should not affect the [Laguna Vista] project's environmental review process." Mr Floreke went on to say that any "subsequent presence of the Sebastopol meadowfoam [on the Site]...would not be considered a naturally occurring population."

On November 1, 2005, DFG sent a letter [Eric Larson signing for Robert W. Floerke] to the City of Sebastopol's Planning Director, Kenyon Webster, saying that on May 9, 2005, DFG Habitat Conservation manager Carl Wilcox, and Botanist Gene Cooley met with Scott Schellinger, Bill Schellinger and GBB consultant Marco Waaland on the Site to inspect the Sebastopol Meadowfoam occurrence. It is likely that Sebastopol Meadowfoam plants were removed on this occasion.

Thus it appears that, without enlisting the assistance of either Liam Davis or Dr. Northen, DFG agents, in the company of other VIOLATORS, decided, peremptorily, that the endangered Sebastopol meadowfoam had been transplanted to the Site, and that this constituted a legal justification to remove or destroy them. DFG agents/employees (identified above) with the solicitation and assistance of GGB, Schellinger Brothers, and possibly the City of Sebastopol dug up some or all of the *L. Vinculans* growing in the ACOE'S ' jurisdictional wetland and either destroyed the plants or reduced them to possession and took them away.

The damage to the Sebastopol meadowfoam populations at the Site remains unmitigated. Although DFG has been informed by both the ACOE and FWS that it does not have the legal right to remove the plants, DFG maintains it has the right and will in the future continue to remove listed endangered plants it arbitrarily determines were artificially introduced into the environment. The acts of VIOLATORS which lead to and involved the removal and destruction of the Sebastopol meadowfoam at the Site were not done in good faith. The acts of DFG were arbitrary and capricious.

DFG Warden Matt Parlato, supervised by Lieutenant. Steve Riske, was assigned by DFG administrators to investigate the matter as defined by Robert W. Floerke. The record shows no report of such investigation. In fact, the record is devoid of sufficient information or evidence to determine the basis for DFG's opinion regarding the occurrence of *L. vinculans*, or what subsequently became of the plants.

Ignoring all other evidence, FWS deferred to DFG's official opinion that the endangered plants were not naturally occurring on the Site. As it turned out, the endangered Sebastopol meadowfoam was growing naturally on the Site. *L. vinculans* populations had been documented in the past, and resident populations re-emerged again the following year. On April 19, 2006, Eric Johnson discovered a small clump of delicate white flowers he identified as a reoccurrence of the Sebastopol meadowfoam. Mr. Johnson pointed the rare plant out to all interested viewers on an April 21, 2006 tour of the Site. In March 2007 plants have emerged which look as though they might be *L. vinculans*, but as they have not yet been identified.

## VIOLATIONS OF THE ESA

The actions of VIOLATORS as detailed in this Notice have and continue to have significant adverse impacts on the endangered Sebastopol meadowfoam *(L. vinculans)*.

The fundamental purposes of the ESA are to provide a means to conserve endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b) Under the ESA's citizen suit provision, any person may sue to enjoin any other person, including any federal, state, or local governmental entity alleged to be in violation of the ESA or any of its implementing regulations. 16 U.S.C. § 1540(g)(1)(A)

### ESA § 7 Violations

ESA § 7(a)(1) requires the Services (referred to collectively by the ESA as the FWS and the National Oceanic and Atmospheric Administration) to utilize all programs administered by them in furtherance of the purposes of the ESA. ESA § 7 establishes a process by which each federal agency must consult the applicable Service regarding impacts to listed species.

This consultation process is designed to insure that federal agencies comply with the twin duties of ESA § 7(a)(2): that each federal agency must insure that any action it authorizes, funds, or carries out, in whole or in part, is not likely to either jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated critical habitat. ESA § 7(a)(2) imposes these duties on each federal agency independent of any agreement or other action by the Services.

Federal agency "actions" are defined broadly as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States," including ongoing agency actions. 50 CFR § 402.02. Currently both the ACOE and FWS have the discretion to deny or modify the Project to protect the listed *L. vinculans* on the Site. Thus both the ACOE and FWS are subject to ESA § 7 obligations.

Dr. Philip Northen notified FWS of the presence of the endangered Sebastopol meadowfoam, *L. vinculans* as soon as he had identified it. No authority in statute or regulation allows a federal agency to set aside ESA procedural obligations by merely pronouncing, without persuasive evidence, that endangered flowers were fraudulently planted by someone trying to stop a disputed housing development.

**Failure to Consult**

Despite the obligation of all federal agencies connected with the Project to perform the duties set forth in ESA § 7, no consultation has taken place regarding the presence of any endangered species, plant or animal. FWS is trying to rely on the regulations for "informal consultation" that allow for preemption of a formal ESA § 7 consultation by a determination of "not likely to adversely affect" ("NLTAA"). Normally the NLTAA determination applies only when a species does not occur on a quad sheet or is known to be entirely lacking in potential habitat (rule of reason, preponderance of evidence), and would not apply to this Site with suitable habitat, and past documented presence of ecologically equivalent or identical species (i.e. the WRA 2003 observations, presence of co-occurring indicator wetland species).

The Service had no non-arbitrary basis for a NLTAA determination to circumvent a biological opinion. It instead relied on the flawed and arbitrary DFG's interpretation that the plants were introduced. Even so, that does NOT mean "not likely to adversely affect" the population that was IN FACT present, regardless of its origin. In short, the Service has a procedural "reason" for not proceeding with a biological opinion, but that reason is invalid under regulation. There was in fact an adverse effect on the species known to the Service, but the Service arbitrarily chose to discount or disqualify it without any scientific or legal basis -- just arbitrary deference to DFG..

**No Biological Opinion**

The record for the Project includes no ESA § 7 biological opinion. An ESA § 7 consultation typically results in the preparation by the Service of a written biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). If the Service concludes in the biological opinion that the agency action will not jeopardize the listed species but that the action will nevertheless result in the taking of the species, then the Service must include with the biological opinion a written, incidental take statement which, among other things, must "specif[y] the impact of such incidental taking on the species." 16 U.S.C. § 1536(b)(4)(B)(I).

**No ESA § 7 Biological Assessment**

> "To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action "
> ESA § 7(c)(1) 16 U.S.C. § 1536(c)(1).

The record does contain a Biological Assessment prepared for the City of Sebastopol on March 6, 2002 by GBB. This Assessment, which surveyed only a portion of the Site's vernal pool

wetlands, stated the survey "did not result in observation of any endangered species". The Assessment constitutes neither an ESA § 7 Biological Opinion nor an ESA § 7 Biological Assessment:

1) A Biological Assessment is not a Biological Opinion;

2) The Assessment was prepared by the consultant of an interested party, rather than by a federal agency;

3) The Assessment was not done following consultation with the SECRETARY or in consultation with any federal agency.

Although GBB might have applied for an exemption under 16 U.S.C. § 1536(g), and conducted an independent Biological Assessment to identify any endangered species likely to be affected by the Project, the extant Assessment does not qualify because it was not conducted under the supervision of the appropriate federal agency. 16 U.S.C. § 153(c)(2); see also 16 U.S.C. § 1536(g).

# IMPACT OF THE PROJECT ON LISTED ANIMAL SPECIES

## Adverse Impact on the California Tiger Salamander (*Ambystoma californiense*)

The Project also will likely have an adverse impact on the California tiger salamander (*Ambystoma californiense*) listed as a Threatened/Endangered Species under the ESA of 1973, as amended (16 U.S.C. § 1531 et seq). (Federal Register 69:47211-47248; August 4, 2004).

Although the GBB Assessment did not report observations of *A. californiense*, the City of Sebastopol's Draft EIR identifies potentially significant impacts regarding the potential for the presence of the California tiger salamander on or adjacent to the Site.

### ESA § 7 Violations

As set forth above, ESA § 7 requires each federal agency to consult the applicable Service regarding impacts to listed species.

Despite the fact that both the ACOE and FWS have discretion to deny or modify the Project to protect, and are subject to ESA § 7 obligations, no consultation has taken place. This failure to consult is a violation of ESA § 7. An ESA § 7 consultation typically results in the preparation by the Service of a written biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). No federal agency has generated an ESA § 7 biological opinion, or biological assessment as to whether the California tiger salamander may be present in the area of the Project.

## CONTACT INFORMATION

PLAINTIFFS are Robert G. Evans, an individual residing at 1065 St. Helena Way, Sebastopol, CA 95472, Telephone 707-823-0609, Douglas Rand Emery, an individual residing at 7528 Gates Drive, Sebastopol, CA. 95472, Telephone 707-829-7968, and Northern California River Watch, a non-profit corporation dedicated to the protection and enhancement of the waters of the State of California including wetlands and vernal pools, organized under the laws of the State of California, at address is 6741 Sebastopol Avenue, Suite 140, Sebastopol, CA 95472, Telephone 707-824-4372.

PLAINTIFFS have retained legal counsel to represent them in this matter. All communications should be addressed to:

Jack Silver, Esquire  
Nancy Kay Webb, Esquire  
Law Offices of Jack Silver  
Post Office Box 5469  
Santa Rosa, CA 95402-5469  
Tel. 707-528-8175  
Fax 707-528-8675  

AND

Michael R. Lozeau, Esquire  
Law Office of Michael R. Lozeau  
1516 Oak Street, Suite 216  
Alameda, California 94501  
Tel: (510) 749-9102  
Fax: (510) 749-9103  

## CONCLUSION

The violations set forth in this Notice affect the health, aesthetic, spiritual, recreational, creative and personal enjoyment of PLAINTIFFS who reside and recreate in the affected communities surrounding the Site. Their health, use and enjoyment of this natural resource is specifically impaired by VIOLATORS' violations of the ESA as set forth herein.

Very truly yours,

Jack Silver

cc:  
Michael W. Neville  
Deputy Attorney General  
455 Golden Gate Ave. Suite 11000  
San Francisco, CA 94102-7004  

Christopher J. Carr, Esquire  
Shaye Diveley, Esquire  
MORRISON FOERSTER  
425 Market Street  
San Francisco, CA 94105-2482